JUDGE CARR,
delivered his opinion, in which the other Judges concurred.*
This is au appeal from an interlocutory decree of the Staunton Chancellor. The suit was brought by seven out of seventeen of the sureties of D. Ragan, as deputy Sheriff of Rockingham, against Fawcett and others, the sureties of the same Ragan, in his private capacity. It is a scramble between these two classes of sureties for the wreck of an insolvent’s estate. In canvassing the correctness of the Chancellor’s decree, it may be best to treat the subject in the order he has pursued.
1st Question. Does the trust deed to Garnbill and Fawcett, afford protection to those who were bound 'as sureties with them? The Chancellor thinks not. He places it principally on the ground of contract and intention. The deed clearly on the face of it provides only for the payment by Garnbill or Fawcett; and indemnity to them is its sole object. It gives no lien to the other sureties. They are not even parties to it. And here the case differs in the Chancellor’s opinion, from West v. Belches, 5 Munf. 187; where there was once a lien for the whole debt to both ^sureties, though that lien was after-wards abandoned, by the surety to whom this Court gave protection under it. The examination which I have given to this subject, has conducted my mind to a conclusion different from the Chancellor’s. I think that, both upon principle and authority, the co-sureties have a right to throw the whole burthen of the debts upon the subject mortgaged to one of their body for his security. I do not consider this so much a question of intention or contract, as of the effect of the deed, under *416 the influence those settled principles of equity, which bear upon it. All the obligations given, by Ragan and his sureties, are joint and several. Each is under a several obligation to pay the whole. The creditor may throw the whole burthen upon any one of them. The principal has given to two of the co-sureties, Fawcett and Gam-bill, a deed of trust on land, for their indemnity; and if the whole money be made out of either of them, the land must be bound for the whole, to indemnify them. Here, then, is the property of the common debtor, bound for the debt; and the question is, will not the established principles of equity throw the whole burthen upon that fund, in ease of all the sureties?
There are several rules on this subject, which seem to me connected with each other, and resting upon the same general •grounds. If B. and C. are bound to A. for a debt, B. as principal and C. _as surety, and B. gives C. a mortgage or other lien to secure him, A. can resort to this. 1 Equ. Cas. Abr. 93; 5 Bac. Abr. 168; 11 Ves. 12. Why? Not on the ground of contract, for there is none giving A. a lien; but because it is the property of the debtor, pledged (though not to his credit) for the debt. So it is with the contribution. Our act of Assembly, which gives the right to one surety to call on the others, only reduced to statute law, what had long been the law of equity. The whole doctrine of principal and surety, with all its consequences of contribution, &c., rests upon the established principles of a Court of Equity. There is no express *contract, between the sureties, for contribution. It results from, the maxim, that equality is equity. Again; a surety will be entitled to every remedy which the creditor has against the principal debtor; to enforce every security, and all means of payment; to stand in the place of the creditor, even as to securities entered into, without the knowledge of the surety; having a right to have these securities transferred to him, though there was no such stipulation, "and to avail himself of all those securities against the debtor. And the creditor can do' nothing to invalidate or discharge the security he has taken from the principal debtor, to the prejudice of the rights of the surety; and if he has done such act, and disabled himself from transferring these securities to the surety, he will (unless in so doing he acted without knowledge of the other’s rights, and with good faith, and just intention) he precluded from so much of his demand against the surety, as this latter might have procured, if the transfer could have been made; and all this, not upon the ground of contract, but upon a principle of natural justice; the same which regulates the doctrine of contribution among sureties. The creditor may resort to either for the whole, or to each for his proportion; and as he has that right, if he, from partiality to one surety, will not‘enforce it, the Court gives the same right to the other surety, and enables him to enforce it. For these principles, I refer generally to Poth. on Oblig. No. 437, 496, 519, 530; 3 Vern. 608; 2 Ves. 622; 3 Madd. Ch. Rep. 437; 10 Ves. 412; 11 do. 22; 14 do. 162; 1 Johns. Ch. Rep. 412; 2 do. 554; 4 do. 130; 2 Bos. & Pull. 270.
Let us apply these doctrines. If the creditor has a right to avail himself of any lien given by the debtor, to a surety, because it is the property of his debtor pledged to pay that debt; does not a surety stand upon quite as strong ground, when the common debtor has given to a co-surety a lien to secure him? If the surety is entitled to stand in the shoes of the creditor, and avail himself of securities given by the debtor to him, has he not the same right, the *same equity, where these securities have been given by the debtor to a co-surety? If equality be the rule, and the creditor shall not be permitted to throw the whole bur-then on one surety; is it more consonant to natural justice, that the debtor should have this power — that he, for whom all the sureties have become bound, on the understanding of community of burthen and risque, and on the" faith of the property he then held; — should have the power of selecting a favored co-surety, possibly (though the remark cannot apply to this case) the decoy-duck for the rest; and by a conveyance of the common fund, for his benefit, leave the others exposed to the payment of the debt, without a chance of indemnity? And, if it is not right, that the debtor should thus violate the law of equality, how shall we prevent it in a case like the present, where the property conveyed to two sureties, is sufficient to discharge the debts, for which the whole are bound? Plow, but by throwing the whole burthen upon that fund (the‘.property of the common debtor,) which has been conveyed for the benefit of these favoured' sureties? I see no other way. Suppose, in the cases before us, the creditor had levied his executions -on the property of Fawcett and Gambill, and made the whole money out of them; would equity have permitted them to call on the co-sureties for contribution? No! because, they had in'their own hands, property of the debtor, sufficient to indemnify them. This is most evident, both from the reason of the case, and from the authority of M’Cormick’s administrator v. Oban-non’s executor, &c. 3 Munf. 484, where it is decided, that equity will not compel a surety to- contribute, unless it appear that due diligence had been used, without effect, to obtain re-imbursement from the principal debtor, or that he was insolvent. In one case, Fawcett and Gambill, without waiting to be compelled by an execution, have paid the whole. Does this change the equity of the case? Surely not. They have in their hands a full indemnity. But, I have dwelt longer, perhaps, on the subject, than I ought, without noticing-*what I consider a direct authority of this Court, on the very point; I mean the case of West v. Belches, 5 Munf. 187. I cannot perceive the distinction taken between that case and this. There, Belches and Willis were sureties for Grymes. To secure them, he gave them a lien on two negroes. Belches afterwards consented to cancel this lien, and that Grymes should *417 execute another, on all his personal estate, for the payment of certain debts, and among them, this one; for which Willis and Belches were sureties. Grymes’s personal estate proved insufficient to pay the debts, and an execution was levied on the property of Belches. Pie filed his bill to stay proceedings, and for general relief. The Court say, “admitting that Belches consented, that upon the execution of the deed to Hughes and Camp, (the second deed of trust,) his own lien on the negroes should be released, he did not release, nor was he competent to release it, as it relates to Willis, who was no party to the transaction. As to Willis, therefore, the said deed is still in full force. The Court is of opinion, that even if Willis had been no party to the judgment sought to be in-joined, nor to the execution, it would be competent to Belches, after paying off the same, to resort to him as a co-surety, for contribution of a moiety thereof; and, that for the purpose of preventing circuity, and getting payment out of the proper fund, it would be also competent to him, as standing in the place of Willis, to go for the said moiety against the negroes conveyed by the said deed. The Court is also further of opinion, that under that hypothesis, it would be competent for the appel-lee, (Belches,) to stand in the place of Willis, and charge the said negroes for the whole sum. Nothing is more consonant to natural justice, than that the proper debts of every man should be paid out of his own estate, in ease of innocent sureties, and that, that property of his in particular, should be subjected, which has been bound thereto by a specific existing liett. These principles will avail the appellee, (Belches) supposing him to have released for himself, his own proper lien, created by the first deed.”
*The principles here laid down by this Court, seem to me to be the very principles which I have been laboring to shew, from other sources, are the established doctrines of equity. And this is still more clear, from the reference, in the same opinion, to the case of Eppes v. Randolph, 2 Call, 125, where a surety, discharging the debt of a bond creditor, is put in his place, and given access to the land; the Court declaring, that the doctrine of substitution, established in that case, fully supported the decision in West v. Belches. The Chancellor seemed to think, that however the Court might give the co-sureties indemnity out of the trust fund, if the question were between them and the debtor alone, it could not do so, when the debtor had parted with his interest to subsequent incumbrancers, who were also innocent sureties. I cannot think that this makes a difference. So soon as Ragan executed the deed for the benefit of Fawcett and Gambill, the principles of equity attached, and the rights of the co-sureties accrued. Nor could any subsequent act'of Ragan’s detract from those rights, or affect the application of those principles. After the execution of the deed, nothing resided in Ragan, but an equity of redemption. He could convey no more to the subsequent incumbrancers; and they could only come in, upon the ground of redeeming all prior incumbrances to the full extent which these had, when their deed was executed. But, besides this reasoning, there is, in the same case of West and Belches, authority for this position. There, as well as here, was a second incumbrance, no way impeached; yet, it was not thought to limit or narrow at all the rights or equity of the co-surety. I conclude, therefore, that the deed of trust from Ragan to Fawcett and Gambill, rendered the land liable for the whole of the debts, in ease of their co-sureties.
There are several other important points raised in this cause; such as: 1st. Was the sale under Fawcett’s and Gambill’s deed, authorised by it? 2d. Was it fairly conducted? 3d. Ought the compromise with Richard Ragan *to be set aside? These, I say, are important points; but, really, I cannot see how the plaintiffs are more interested in this discussion and decision, than any other person in the community. The land is wholly swallojwed up by liens prior to theirs. Taking Ragan’s tract as containing 900 acres, and the fair price as $19 50, (which is considerably more than the evidence justified,) the value would be $17,550 00
Or, say that the 63 acres, sold to Gambill, was worth $1,873 00
And the 837 acres sold to Faw-cett at $19 50 per acre, making $17,331 00
And, in the aggregate, equal to $19,204 00
This is the utmost, and more in truth, than can be claimed. Now, take the debts for which this land is bound, and which must be paid before the Official sureties can claim a cent.
Gambill’s suretyships, $1,873 00
Fawcett’s ditto, paid and bound for, 19,833 00
Fletcher bound for 4,504 00
-$20,210 00
Leaving a balance beyond the utmost value of the land, of $7,006 00
Suppose we throw in $5,000 of this for errors in the debts of Ragan, for which the sureties are bound. This is a liberal allowance; still there will be upwards of $2,000 attached upon this land, beyond its value, and claiming priority to the official sureties. What possible chance, then, can these plaintiffs have, of sharing in this fund? Even ’¡'supposing the land bound only for the proportions of Fawcett and Gambill, in those cases where there are co-sureties, still the amount of the prior liens is beyond its value; especially when we add the interest which three years of litigation, useless and wanton litigation, have added. I say litigation useless and wanton, in every point of view. Useless, because the plaintiffs had no interest in the subject matter. Wanton, because from the first, Fawcett and Gambill made offers, which ought not for a moment to have been rejected, unless the official sureties had abandoned all expectation of relief *418 from the land. “Embark with us,” (said Fawcett and Gambill to them,) “in the private suretyships by which we are bound, and we will give up to your management this whole fund, for the common benefit of all the sureties. Nay, more, I (said Gam-bill) will add $100 to the stock; and I (said Fawcett,) will give you up my claims on Ragan for all I have paid, or may be compelled to pay as his public surety, if you will only release me from my private sure-tyships.” Could better terms have been asked ? Were they not more favorable than equity offers to a subsequent incum-brancer, seeking to get possession of the mortgaged subject? Must he not redeem the prior incumbrancers? Yet, this proposition was rejected. Again; after the sale of the 5th of April, 1821, and the dissatisfaction expressed by a few of the official sureties at that sale, Fawcett offered, either to set aside all that had been done, give up the fund to the official sureties, and take a deed of trust from them for hi's indemnity for the private debts; or, to let everything stand, and he would convey to them the land he had bought, and take a deed from them, to indemnify him for the private debts unpaid. Could there be terms' offered, more liberal than these? Yet, they were rejected. Again; at the argument in the Court below, propositions equally fair were renewed. The plaintiffs rejected them. Thus, from the origin, they seem to have been most obstinately determined to litigate the matter to the utmost extremity; *and, on this principle alone, can I account for their appeal from a decree, in which all the errors that I can discover are in their favor. As to the other questions, I deem it only necessary to add, that I incline to think the trustee had power to sell; because, Gambill and Fawcett, being urged to speed by the strongest necessity, did nothing improper, either in directing suits, or confessing judgments. The payments, though not in money, were a discharge of the debts, and so good against Ragan; and having been made under judgments, may be considered compulsory.
With respect to the sale itself, I cannot say that I approve of the manner in which it was conducted. The requisition of specie within two hours, was certainly calculated to' discourage competition. Yet, when the question is, shall the sale be set aside? we must ask, was any sacrifice produced by this unusual proceeding? It seems, that it prevented no person present, from bidding. All agree, that the land sold to Gambill went at its value; and, though, that to Fawcett was nominally sold low, yet it was charged with the prior liens to Gray; and, these, together with the debts Fawcett is bound for, and which are liens on the land, will amount to more than its value; taking the highest estimate, and charging Fawcett with all that part, which, under the compromise with Richard Ragan, he conveyed to him. As to that compromise, I think with the Chancellor that it is advantageous to all parties, and ought not to be disturbed. This (it was objected in the argument) was trying a writ of right in a' Court of Equity. I do not think so exactly. I agree that Courts of Equity have no direct jurisdiction over legal titles; and, where the case depends on a simple legal title, and is brought up directly by the bill. I should consider such a bill de-murrable. But, equity does sometimes decide on the legal title, when it arises incidentally. 3 Johns. Ch. Rep. 519. It arose in that way here, and was brought up too, by the very persons who now object to the jurisdiction.
*1 have touched these questions so briefly, because (as I said) I cannot conceive the plaintiffs interested in their decision. Why should they seek to disturb the sale of the land, when under no circumstances can they profit by it? This is so evident, that Fletcher, a prior incumbrancer, states in his answer, that his prospect for indemnity was very small, and even that would be blasted, if this litigation should proceed. Nay, of the official sureties themselves, (17 in number) ten are well satisfied with the sale; and it will be recollected, that by the terms of the deed, a majority of them have a governing power in proceedings under it. These ten are made defendants. They state that they wish the sale to stand, and the only questions they make are, whether the co-sureties are protected by the deed to Faw-cett and Gambill, and whether the provisions of that deed extend to debts not specially named. The first point I have discussed. The second was very properly given up by the counsel for the appellants in the argument. In the supplemental bill, it is charged that Fawcett, as collector of the United States, recovered several judgments, and put the executions into Ragan’s hands, during the time that the plaintiffs were sureties: that Ragan paid Fawcett monies to be applied to these executions, which Fawcett applied to private claims he had against Ragan, and then recovered the amount of the executions against the official sureties, who were ignorant that such -payments had been made. Fawcett, in his answer, asserts, that the subject of these allegations was well known to the plaintiffs, and much discussed, prior to the judgments at law: that the plaintiffs might have defended themselves there: that the accounts between himself and Ragan had been properly settled and ought not to be disturbed. The Chancellor has sent' this part of the cause to a commissioner. _ But, it seems to me, that this new allegation is so wholly distinct from, and unconnected with the topics of the original bill, as not properly to constitute matter for a supplemental bill; and, if it did, I rather *think the answer might have settled it, without the aid of a commissioner.
There is another point, on which I am compelled to differ with the Court below; that is, the order that each party pay his own costs. The plaintiffs, without any just ground, and in the teeth of the fairest propositions, have brought this suit; which, though it can do them no good, has probably injured, most essentially, some of the defendants. They have stuffed the record with innumerable depositions; forced the *419 other party, in self-defence, to incur great expense; and, in my opinion, ought to pay all costs.
I am of opinion, that the decree be reversed: that the plaintiffs pay the costs of the Court below, as well as here; and that the bill be dismissed without prejudice to any suit, which the plaintiffs may be advised to bring, on the subject of the supplemental bill, relative to the collector-ship, and the accounts growing out of those transactions.
Decree reversed, and bill dismissed.

Judges Brooke and Greek, absent.